IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GLEN TATE, et al., | ) |
| Plaintiffs, | ) |
| v. | ) No. 02 C 3432 |
| SHOWBOAT MARINA CASINO PARTERNSHIP, et al., | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiff Glen Tate ("Tate"), individually and on behalf of other employees similarly situated and other plaintiffs named on Exhibit D to Tate's Third Amended Complaint[1], sued Showboat Marina Casino Partnership d/b/a Harrah's East Chicago Casino & Hotel, Harrah's Operating Company, Inc. ("Harrah's"), and the *M/V Win Star*, for seamen's wages and damages for delay in payment brought under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. 201, et seq. Defendants Showboat Marina Casino Partnership and Harrah's Operating Company, Inc.

---

[1] There are fifty remaining Plaintiffs in this action. They are: Ricardo Abella, Shane Adams, Crystal Baker, John Benjamin, Brian Burgess, Keith Brian Carter, Beverly Clary, John Colpitts, Percy L. Davis, Jr., Carlos Degollado, Timothy Dombrowski, Nicholas Galmiche, Rodolfo Garcia, Melinda Gonzalez, Richard Grayson, Jennifer Grish, Greg Hendryx, Albert Herrera, Alejandro Herrera, Monique Howard, John A. Immerfall, Hedrick A. Johnson, Paul Johnson, Reginald D. Johnson, Larry R. Jones, Kevin J. Kelley, Loretta Kornacki, Stathis Kourtis, Bonnie Kramer, Alvin I. Latondress, Octavio Martinez, Horace McClennofl, Carol Meyer, Kurt Meyer, Dee Ann Nichole Mills, Alvin Lee Norman, Francis Oglesby, Jerry S. Pauk, Diane Rose Ponce, Robert Reilly, Dwyen Ringbauer, Diane Rosenfeldt, Joe Ross, Roy G. Smith, Jesus Soto, Roberto Soto, Glen Tate, John Torres, Jeff Washington, and Ranny Westby. (R. 359-1; Pl.'s Resp. to Def.'s Stmt. Mat. Facts ("Def. SMF") ¶ 3.)

("Defendants") move for summary judgment arguing that: (1) Plaintiffs are exempt from the Fair Labor Standards Act under 29 U.S.C. § 213(b)(6); (2) Plaintiffs' overtime pay after August 2002 defeats their claims to such wages; (3) Plaintiffs cannot collect on their liquidated damages claims; and (4) Plaintiffs' claims are partially time-barred as a matter of law. For the reasons discussed below, the Court grants Defendants' motion.

## BACKGROUND

Except as noted, the following facts are undisputed.

### I. Parties

All Plaintiffs are, or were, members of the marine crew and deck department of the *M/V Winstar* ("*Winstar*") at East Chicago, Indiana between November 1, 1996 and the present. (R. 359-1; Def. SMF ¶ 4.) Showboat is an Indiana partnership that operates a casino in East Chicago, Indiana. (*Id.* ¶ 5.) Harrah's is a corporate affiliate of Showboat that employed members of the *Winstar* marine crew after October 2001. (*Id.* ¶ 6.)

### II. The *Winstar*

The *Winstar* has always been under its own power with an operation engine and navigation and power systems in place and functional. (*Id.* ¶ 65.) The *Winstar* has remained afloat, not dry-docked. (*Id.* ¶ 66.) Although, Plaintiffs note that it is now completely dockside and was "never in motion 93% of the time." (*Id.* ¶ 65.)

Prior to August 2002, the law generally required gambling boats in Indiana harbor to cruise Lake Michigan when gambling took place on the vessel.[2] (*Id.* ¶ 68.) In August 2002,

---

[2] Prior to August 1, 2002, if the water temperature was below 38 degrees, or certain weather, tide, or other conditions were present, then Indiana law did not require the vessel to leave the dock. (R. 371-1; Def.'s Resp. Pl. Counter-Stmt. Mat. Facts ("Pl. SMF") ¶ 3.)

2

Indiana law and gaming regulations permitted dockside gambling aboard the *Winstar* and other Indiana-harbored gambling boats. (*Id.*)

### III. Riverboat Services

From October 1996 through October 1, 2001, Riverboat Services, Inc. ("Riverboat Services") served as the agent of Showboat and master of the *Winstar*. (*Id.* ¶ 7.) Riverboat Services operated the *Winstar* pursuant to the Marine Management Services Agreement ("MMSA") with Showboat. (*Id.*) Harrah's is not a party to the MMSA. (*Id.* ¶ 8.)

As of October 1, 2001, Harrah's bought Riverboat Services out of the MMSA. (*Id.* ¶ 9.) Therefore, Riverboat Services no longer employed the *Winstar's* marine crew, including Plaintiffs, nor was it master of the vessel. (*Id.*) Harrah's thereafter employed the *Winstar's* marine crew. (*Id.* ¶ 10.)

### IV. *Winstar's* Marine Crew

Plaintiffs all are, or were, employed aboard the vessel as full-time members of the *Winstar's* marine crew in the deck or engine departments. (*Id.* ¶ 21.) Plaintiffs are all able-bodied seamen, ordinary seamen, fire watches, or oilers. (*Id.* ¶ 22.) None of the Plaintiffs are, or were, croupiers, cashiers, bouncers, dealers, waiters, or entertainers aboard the *Winstar*. (*Id.* ¶ 23.) Rather, all served as members of the ship's operating marine crew. (*Id.*) The marine crew, of which Plaintiffs were members, manned and operated a 3,150 horsepower, 2,803 gross ton vessel pursuant to the United States Coast Guard ("U.S.C.G.") licensing requirements as set forth in the vessel's Certificates of Inspection. (*Id.* ¶ 24.) Plaintiffs performed their duties subject to the authority of the Master of the vessel, and the ships rules obligated them to obey any lawful command of the captain or master on watch. (*Id.* ¶ 25.)

3

Plaintiffs were subject to and followed a chain of command, comprised of the Captain, First Mate, Able-Bodied Seamen, Ordinary Seamen, and Fire Watches. (*Id.* ¶ 26.) If Plaintiffs did not follow the maritime chain of command, their superiors could discipline or even terminate them. (*Id.* ¶ 27.)

*Winstar's* captains and mates trained and evaluated the marine crew. (*Id.* ¶ 29.) The *Winstar*, all of its operations and the crew, including Plaintiffs, are subject to the U.S.C.G. regulations. (*Id.* ¶ 30.) The U.S.C.G. has authority to shut down all vessel operations if the *Winstar* fails to comply with its regulations. (*Id.* ¶ 31.) The U.S.C.G. requires a specified number of marine crew employees by title (including fire watches, ordinary seamen, oilers, and able-bodied seamen) who must remain aboard the vessel at all times. (*Id.* ¶ 32.)

The distribution of weight on the vessel is a critical consideration. (*Id.* ¶ 35.) In fact, when such things as table games or slot machines are moved, the U.S.C.G. must approve the plan prior to any moves. (*Id.*) Weight distribution is important for the stability and trim of the vessel and is thus a safety issue. (*Id.*)

Seaman's duties customarily include, but are not limited to: performing maintenance of the vessel, cleaning of the vessel and generally keeping the vessel shipshape, handling lines, swabbing the decks, performing drills, cleaning the floors, painting the vessel, preparing the food, emptying trashcans (especially where they may pose a fire hazard), performing housekeeping duties, and manning passengers ramps. (*Id.* ¶ 36.) The primary responsibility of a *Winstar* marine crew employee was to ensure the safety of the passengers, crew, and vessel. (*Id.* ¶ 37.) The Captain required the marine crew to look out for fire hazards or other unsafe hazardous situations and report them to the captain. (*Id.* ¶ 38.) The *Winstar's* policies required Plaintiffs to demonstrate

4

and maintain competence in certain skills that ensured the safety of the passengers and the vessel. (*Id.* ¶ 39.) In particular, Plaintiffs performed maritime drills, including man-overboard, fire, and life raft drills. (*Id.* ¶ 44.) Although, Plaintiffs explain that they spent a minimal amount of time in such training.[3] (*Id.*)

The captain and mates need properly trained marine crew or seamen to safely moor, unmoor, and sail the *Winstar*. (*Id.* ¶ 40.) Plaintiffs explain that they only handled lines for less than 30 minutes when the *Winstar* left the dock, returned to the dock or when there was bad weather. (*Id.*)

The captain and mates still need properly trained marine crew or seamen when the *Winstar* is dockside. (*Id.* ¶ 43.) Weather conditions can disrupt the vessel and the marine crew would need to adjust lines and ramps for the safety of the vessel and its passengers, even when dockside. (*Id.*) When Plaintiffs stood watch on the rampway from the shore to the vessel, their primary responsibility was to ensure the safety of the passengers getting on and off the vessel. (*Id.* ¶ 41.)

Plaintiffs painted the exterior and interior of the vessel and cleaned the vessel. (*Id.* ¶ 45, 50.) Plaintiffs also stood watch during cruises. (*Id.* ¶ 48.) Plaintiffs shoveled snow off the decks in the winter. (*Id.* ¶ 49.) While Plaintiffs performed certain housekeeping duties, the *Winstar* had housekeeping employees that made less money than the marine crew. (*Id.* ¶ 52.)

A seaman's duties encompass following all the lawful orders of the captain or master of the vessel. (*Id.* ¶ 54.) The Riverboat Services Marine Operations Employee Handbook illustrates some of the seamen's duties. (*Id.* ¶ 55.) Pursuant to the Riverboat Services Handbook, "[s]afety

---

[3]In particular, Plaintiffs explain that they usually spent no more than one hour each week in safety training. (*Id.* ¶ 39.)

of the passengers, crew and vessel is the primary responsibility of the crew." (*Id.* ¶ 57.)

As able-bodied seaman and ordinary seaman, Plaintiffs' duties included, but were not limited to: obeying all lawful commands, performing duties in a seamanlike manner, standing lookout watches, handling mooring lines, carrying out vessel and equipment cleaning, performing maintenance and painting duties, assisting in the loading and unloading of any and all equipment, supplies and cargo, familiarizing themselves with assigned duties for drills and emergencies, and promptly reporting the existence of all potential hazardous conditions. (*Id.* ¶ 58.) While working as firewatch, Plaintiffs' duties included constantly patrolling their assigned areas to ensure that the vessel was secure, meaning that there were no fires or fire hazards, strange odors or any abnormal sights or sounds. (*Id.* ¶ 59.) While working as oilers, Plaintiffs' duties included: obeying all lawful commands, being familiar with their assigned duties for drills and emergencies, standing watch, assisting in loading and unloading equipment and cargo, promptly reporting the existence of potential hazardous situations, and having the training and experience necessary for the job of an oiler. (*Id.* ¶ 61.)

Plaintiffs contend that they have not received certain overtime pay to which the law entitles them under the FLSA.

## ANALYSIS

### I. Legal Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The Court considers the evidentiary record in a light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001).

## II.     Plaintiffs Are Exempt Under the FLSA

Defendants argue that Plaintiffs are exempt from the overtime provisions of the FLSA under 29 U.S.C. § 213(b)(6) as "any employee employed as a seaman on a vessel." *See also* 29 C.F.R. § 783.31. Defendants rely on the Seventh Circuit's recent decision in *Harkins v. Riverboat Services, Inc.*, 385 F.3d 1099 (7th Cir. 2004)[4], for the proposition that because the law classifies Plaintiffs as "seamen" for purposes of entitlement to special employment benefits, the court presumes that they are "seamen" under § 213(b)(6) of the FLSA and therefore exempt from the FLSA's overtime provisions. Defendants further rely on *Harkins* in arguing that because the presumption applies in this case, the Court can decide as a matter of law, that even viewing the facts in the light most favorable to them, Plaintiffs cannot rebut this presumption. In opposition to Defendants' motion, Plaintiffs argue that because *Harkins* is an appellate opinion affirming a jury's verdict, it does not control the Court at this summary judgment stage. Instead, Plaintiffs

---

[4]The *Harkins* plaintiffs were employed on the same vessel as Plaintiffs here. The *Winstar* was formerly known as the *Showboat Mardi Gras Casino,* the name that the Seventh Circuit's opinion uses. Plaintiffs' counsel in this case previously attempted to include some of the *Harkins* plaintiffs as plaintiffs in this case, but the Court dismissed them with prejudice.

7

argue, the Court should rely on the FLSA and its implementing regulations to find a triable issue of fact regarding whether Plaintiffs are exempt.

### A. The Seventh Circuit's Decision in *Harkins*

The Seventh Circuit has recently provided legal guidance that directly relates to the facts here. The Plaintiffs in *Harkins* sued Riverboat Services for overtime pay under the FLSA. A jury found that the plaintiffs were seamen within the meaning of the seaman's exemption from § 213(b)(6) of the FLSA and therefore exempt from making a claim for overtime pay. The plaintiffs appealed, arguing that the trial court should have ruled as a matter of law that they were not seamen under the FLSA's seaman's exception.

The Seventh Circuit recognized that the *Harkins* plaintiffs had conceded that the law considered them seamen for purposes of entitlement to special employment benefits. The Seventh Circuit then held that "when persons employed on a ship, even so atypical a one as an Indiana gambling boat, are classified as seamen for purposes of entitlement to the special employment benefits to which seamen [] are entitled, a presumption arises that they are seamen under the FLSA as well." *Harkins*, 385 F.3d at 1103. Judge Posner, writing for the panel, recognized that an employee can rebut this presumption, for example, in the case of a "waiter employed on a cruise ship to serve meals to the passengers at regular hours." *Id.* The Seventh Circuit, however, held that the *Harkins* plaintiffs could not rebut the presumption because no plaintiff was a "croupier, cashier, bouncer, dealer, waiter, or entertainer." *Id.* Instead, the Seventh Circuit held that in light of the presumption the plaintiffs were employed as seamen and exempt under the

FLSA.[5] *Id.*

Judge Posner went on to note that even when a ship is docked, the marine crew remains responsible for its safe operation. *Id.* At 1104. Therefore, Judge Posner declined to set a percentage of time in which a ship must be at sea in order for its crew to qualify for the FLSA's seaman exemption, even though the vessel in *Harkins* was dockside at least 90% of the time. *Id.* at 1100, 1104. Instead, the inquiry is whether the "plaintiffs spend their time performing duties that are necessary to the operation of the [vessel] because it is a ship or because it is a casino." *Id.*

### B. Seventh Circuit Law Creates a Presumption that Plaintiffs Are Exempt Under the FLSA

Plaintiffs do not dispute that the *Jones Act* covers them. (Pl.'s SMF ¶ 88.) The *Jones Act*, 46 U.S.C. § 688, extends the Federal Employers Liability Act's employer-liability standard to seamen. *See Harkins*, 385 F.3d at 1103 (citing *Miles v. Apex Marine Corp.*, 498 U.S. 19, 23-24, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990)). Because the *Jones Act* considers Plaintiffs as "seamen," they are entitled to "special employment benefits." Accordingly, under *Harkins*, a presumption arises that Plaintiffs are seamen under the FLSA as well. 385 F.3d at 1103.

---

[5] Plaintiffs point out that in *Harkins*, the district court allowed the jury to decide the issue of whether the plaintiffs were seamen under the FLSA. As Defendants explain, however, the Seventh Circuit in *Harkins* established the presumption that employees are seamen under the FLSA when the employees are also considered seamen for purposes of entitlement to other benefits *after* the district court rendered its opinion. As discussed further in Section II.C.1, the Court agrees with Defendants that the *Harkins* presumption allows the Court to decide this issue as a matter of law. Here, the question is whether, viewing the facts in the light most favorable to Plaintiffs, they could ever rebut the *Harkins* presumption at trial. Had this legal presumption been established at the time of the *Harkins* district court action, the Court believes the *Harkins* district court would have decided this issue as a matter of law rather than allowing the issue to go to the jury.

### C. Plaintiffs Cannot Rebut the Presumption that They Are Exempt Under the FLSA

Because the Court presumes Plaintiffs to be "seamen" under the FLSA's exemption under § 213(b)(6), the issue becomes whether any genuine dispute exists regarding Plaintiffs ability to rebut this presumption at trial.

#### 1. The Court can Decide the Seamen Issue as a Matter of Law

Plaintiffs first attempt to procedurally distinguish this case from the situation in *Harkins* where the trial court allowed a jury to determine the issue of whether the Plaintiffs were seamen under the FLSA. In *Harkins*, however, the trial court did not have the guidance of Judge Posner's opinion deciding issues on appeal in that case. In that opinion, the Seventh Circuit established the *Harkins* presumption, that, as discussed in Section II.B., applies in this case. Because of this presumption, the Court can decide as a matter of law that even viewed in the light most favorable to Plaintiffs, the facts here do not allow a jury to find that Plaintiffs rebut the presumption that they are seamen, exempt under the FLSA. Indeed, had the *Harkins* trial court had the benefit of the Seventh Circuit's opinion in that case, the trial court could have decided, as a matter of law, the issue of whether the plaintiffs could have rebutted the presumption that they were seamen under the FLSA. Even Plaintiffs, at page 1 of their Opposition Brief, concede that the Court may decide this issue as a matter of law. (R. 357-1; Pl. Opp. Br. at 1.)

#### 2. There is No Genuine Dispute that Plaintiffs Perform Duties Related to the Operation of the *Winstar* as a Ship and Not as a Casino

Plaintiffs next attempt to factually distinguish themselves from the *Harkins* plaintiffs by arguing that although they had some seaman duties aboard the *Winstar*, they performed non-

maritime services more than 20% of the time.[6] Therefore, Plaintiffs contend that a genuine issue of fact exists whether the Plaintiffs can rebut the presumption that they are exempt under the FLSA's seaman exemption.

In making this argument, Plaintiffs rely heavily on their contention that the *Winstar* was docked more than 90% of the time, and therefore any housekeeping activities performed by Plaintiffs were not seaman activities.[7] Defendants admit that the *Winstar* was docked 92% of the time. Under *Harkins*, however, the *Winstar's* dockside status is insufficient to rebut the presumption that Plaintiffs are seamen. Indeed, in *Harkins*, the facts showed that the vessel was docked over 90% of the time. Judge Posner, however, recognized that even when the vessel was dockside, the marine crew was still "responsible for its safe and efficient operation and

---

[6] Plaintiffs, in fact, assert that at trial they will show that virtually all of the plaintiffs spent at least 80-90% of their time in non-maritime activities.

[7] In support of its assertion that the *Winstar* was docked 93% of the time, Plaintiffs cite to the affidavit of an employee from Plaintiffs' counsel's law firm, concluding that "93.6% of the time the [*Winstar*] remained dockside." (R. 356-1; Pl. App. Ex. 8.) Defendants have moved to strike this affidavit. Defendants argue that Plaintiffs' witness lacks appropriate foundation and therefore the affidavit is inadmissible. Defendants also contend that the affidavit is improper because during discovery, Defendants sought to depose Plaintiffs' witness, but Plaintiffs represented that they would not call this witness to testify at trial, and that the witness no longer worked at Plaintiffs' counsel's firm. Plaintiffs' counsel backed out of this representation and presented the subject affidavit in conjunction with summary judgment briefing. Plaintiffs' counsel represented to the Court that Defendants' motion to strike was moot because the affidavit at issue only supported Plaintiffs' affirmative motion for summary judgment, which the Court had already denied, but Plaintiffs did not rely upon that affidavit in opposing Defendants' motion. Defendants now point out that this representation from Plaintiffs' counsel was also false because Plaintiffs do, in fact, rely on this affidavit in asserting that the *Winstar* was dockside 93% of the time.
The Court agrees with Defendants. Plaintiffs' counsel expressly represented to the Court that Plaintiffs were not relying on this affidavit for their opposition to Defendants' summary judgment motion. Plaintiffs, however, cite to this affidavit multiple times in their counter-statement of material facts. Based on Plaintiffs' counsel's blatant misrepresentation, the Court strikes the affidavit concluding that the *Winstar* was docked 93% of the time.

11

maintenance." 385 F.3d at 1104. The Seventh Circuit, declined to set a percentage of time at sea that would establish that a ship's marine crew were or were not seamen. *Id.* The court explained that the percentage of time the ship is at sea should not be the relevant inquiry because "[t]hat would make it difficult for the employer to figure his costs." *Id.* Therefore, in light of the Seventh Circuit's instruction, the Court does not consider the fact that the *Winstar* is docked 92% of the time to impact the outcome here.

Plaintiffs also direct the Court to the FLSA's implementing regulations, 29 C.F.R. 783.31. These regulations provide that to qualify for the exemption, the employee's services must be "rendered primarily as an aid in the operation of such vessel as a means of transportation, provided he performs no substantial amount of work of a different character." The Seventh Circuit in *Harkins*, however, squarely addressed this precise language, noting that "this just means that the employee must be a (more or less) full-time member of the marine crew, that is, the crew that is responsible for operating the ship." *Harkins,* 385 F.3d at 1103-04.

Under the Seventh Circuit's interpretation of the regulations implementing the FLSA, the mere allegation that the employee spends over 20% of his or her time performing "non-maritime" services does not create a triable issue of fact as to whether the employee is a "seaman." Rather, the Seventh Circuit has specified that the Court should focus on whether Plaintiffs spend their time performing duties "that are necessary to the operation" of the *Winstar* "because it is a ship or because it is a casino." *Harkins,* 385 F.3d at 1104. The Court, therefore, analyzes the entirety of the services performed by Plaintiffs to determine whether a genuine issue of fact exists that Plaintiffs can rebut the presumption that they are not "seamen."

Plaintiffs admit that, like their *Winstar* shipmates in *Harkins*, they are fulltime members of

the ships marine crew and do not work as a "croupier, cashier, bouncer, dealer, waiter, or entertainer." (Def. SMF ¶ 23.) *See Harkins*, 385 F.3d at 1103. Further, as provided in the Background Section IV, Plaintiffs performed many services that Plaintiffs do not dispute are maritime functions performed by seamen. Rather, Plaintiffs provide a laundry list of other allegedly non-maritime services performed by Plaintiffs that they contend create a triable issue of fact whether they rebut the *Harkins* presumption. The Court addresses each of these additional categories of facts in turn, to determine whether the services were "necessary to the operation" of the *Winstar* "because it is a ship or because it is a casino." *Harkins*, 385 F.3d at 104.

### a.     Plaintiffs' Service as Security Guards

Plaintiffs contend that the Captain required some of the Plaintiffs to act as security guards on the dock. (Pl. SMF ¶ 9.) The Court agrees with Defendants that the Plaintiffs' service as security guards was directly related to a seaman's primary maritime function of ensuring the safe operations of the *Winstar* and the welfare of its passengers and crew. Some of the Plaintiffs who spent time serving in a security capacity explained that their security service began after the terrorist attacks of September 11, 2001. (R. 340-6; Def. App. Ex. 83 at 75-76; Ex. 87 at 98; Ex. 102 at 112; Ex. 97 at 58-60.) Even if some of Plaintiffs' security services were not directly related to the *Winstar's* status as a ship, the mere performance of some non-maritime services by Plaintiffs does not rebut the presumption that they are seamen.[8] *Harkins*, 385 F.3d at 1104

---

[8]The Court also notes that it would be against Seventh Circuit policy and ignore reality to hold that part-time service in a security capacity related to September 11, 2001 concerns, redefines an employee who would be otherwise classified as a "seaman" under the FLSA. Judge Posner noted in *Harkins* that it is important for "an employer to figure his costs" related to overtime labor. 385 F.3d at 1104. In other words, employers ideally should be able to predict whether their employees qualify as "seamen" under the FLSA. At the same time, especially in the time shortly following the terrorist attacks of September 11, 2001, employers operating tourist

13

(noting that the employee must be "more or less" a full-time member of the marine crew); *see also Weaver v. Pittsburg Steamship Co.*, 153 F.2d 597, 600 (6th Cir. 1946) (seamen were exempt under FLSA's seaman's exception even during a period "downtime" when working as firemen). Absent other significant non-maritime functions, the service of some Plaintiffs in a security capacity related to September 11th threats does not rebut the presumption that they are seamen.

### b.     Plaintiffs' Service Greeting and Assisting Guests

Plaintiffs next argue that the Captain sometimes required them to pass out promotional or other items while greeting casino guests while they stood watch on the rampway. (Pl. SMF. ¶ 10, 11.) Plaintiffs, however, have admitted that when they stood watch on the rampway from the shore to the vessel, it was their primary responsibility to ensure the safety of the passengers getting on and off the vessel. (Def. SMF. ¶ 41.) Plaintiffs' role in ensuring the safety of passengers on the rampway was related to the *Winstar* being a boat, not a casino. As several Plaintiffs explained, the rampway could move as waves moved the vessel, and therefore Plaintiffs had to make sure the rampway remained level. (R. 340-4,5; Def. App. Ex. 13 at 115; Ex. 20 at 19, 55, 77; Ex. 21 at 98; Ex. 24 at 121; Ex. 26 at 27; Ex. 27 at 192-193; Ex. 29 at 80; Ex. 31 at 71; Ex. 34 at 92-93; Ex. 38 at 93; Ex. 39 at 23-24; Ex. 41 at 84; Ex. 44 at 36-37; Ex. 49 at 54-55; Ex. 58 at 137.) Plaintiffs greeted guests to the *Winstar* while Plaintiffs were primarily performing a maritime function. This does not rebut the presumption that Plaintiffs are seamen

---

attractions and other possible terrorist targets, should be permitted to request that all employees take part in some security function in order to ensure public safety. *See First Defense Legal Aid v. City of Chicago*, 209 F.Supp.2d 935, 937 (N.D. Ill. 2002) (court will not ignore reality). The necessity of delegating some security responsibilities to some employees should not disrupt the policy, as explained by the Seventh Circuit, of providing an employer with reasonable certainty as to his labor costs.

14

under the FLSA.

Plaintiffs further argue that they greeted casino guests daily and/or for a substantial portion of their shift. (Pl. SMF ¶ 12.) As discussed, Plaintiffs have admitted that while greeting guests, their primary function was to ensure the safety of guests on the rampway. This argument merely relates to the amount of time Plaintiffs spent performing services with a primarily maritime function, and therefore, reinforces the presumption that Plaintiffs are seamen.

Similarly, Plaintiffs argue that they were subject to disciplinary action if they failed to properly greet casino guests. (Pl. SMF ¶ 13.) The mere fact that Plaintiffs' superiors required them to perform a small task in addition to their primary function does not change the fact that the Plaintiffs were performing a seaman's duty while they were greeting guests. *Harkins*, 385 F.3d at 1103; *see also Weaver*, 153 F.2d at 600.

Plaintiffs also contend that they assisted casino guests getting on and off the *Winstar* by providing wheel chair assistance when necessary. (Pl. SMF ¶ 14.) As discussed above, because the rampway was capable of moving due to waves hitting the vessel, the assistance of passengers on this rampway was a maritime function.

### c. Plaintiffs' Service Cleaning and Replacing Ceiling Tiles

Plaintiffs next set forth that they cleaned ceiling tiles in the casino. (Pl. SMF ¶ 15.) The Riverboat Services' Director of Marine Operations, however, explained that Plaintiffs changed and cleaned the ceiling tiles in order to allow the marine crew to examine and maintain the ceiling space above the tiles so that the ship would pass U.S.C.G. inspections of the wiring in that space. (R. 340-5; Def. App. Ex. 76 at 41.) The Director of Marine Operations further explained that he instituted the routine cleaning and replacement of ceiling tiles after a U.S.C.G. surprise inspection

revealed safety hazzards in the *Winstar's* ceiling space. (*Id.* at 43.) Plaintiffs merely allege that they performed these services, but do not explain why these services would be services related to the functioning of a casino, and not a ship. In particular, Plaintiffs do not contest the Director of Marine Operations' testimony that the purpose behind the cleaning and replacing of ceiling tiles relates to the safety of the *Winstar*. Accordingly, the cleaning and replacement of ceiling tiles are services performed to maintain the safety of the *Winstar* as a ship, and are maritime duties performed by seamen.

Similarly, the fact that Plaintiffs allege that they cleaned ceiling tiles daily and/or for a substantial portion of their shift (Pl. SMF ¶ 16) further supports that Plaintiffs were seamen under the FLSA.

### d.     Plaintiffs' General Housekeeping Duties

Plaintiffs next point to the fact that Plaintiffs regularly performed many other housekeeping duties such as cleaning chandeliers, polishing brass, cleaning gaming machines, cleaning signs, changing light bulbs, cleaning up or removing garbage, cleaning out ashtrays, cleaning up spills, vacuuming carpet and vents, cleaning windows and performing general housekeeping tasks. As Defendants point out, however, Plaintiffs admit that "seaman's duties" include "cleaning of the vessel and generally keeping the vessel shipshape, cleaning the floors, emptying the trashcans (especially where they may pose a fire hazard), housekeeping duties, and manning passenger ramps." (Def. SMF. ¶ 36.) As numerous Plaintiffs testified, Plaintiffs' superiors required them to watch for hazardous conditions, including fire hazards, and report them to the captain. (Pl. SMF ¶ 17.) The Seventh Circuit, in *Harkins*, recognized that even when a ship is dockside, "the marine crew is responsible for its safe and efficient operation and

16

maintenance – for keeping it afloat and clean, scraping the barnacles off its hull, keeping the engines in repair, preventing fires, etc." 385 F.3d at 1104. Judge Posner further explained that "[a]ll this is maritime work, and the member of the ship's crew who do it, thus including the plaintiffs in this case as the jury found, are seamen even during the intervals in which the ship is moored." *Id.* As recognized in *Harkins*, the "housekeeping" activities of Plaintiffs are related to maintaining the "safe and efficient operation" of the ship and are therefore the duties of seamen.[9]

Plaintiffs also allege that some Plaintiffs built lockers, and during casino renovations, removed carpeting, bathroom tiles, bathroom stalls, commodes, bathroom sinks, liquor bars, and ran electrical wires and cables. (Pl. SMF. ¶ 18). Defendants respond that these are merely further examples of seamen's duties that these Plaintiffs only performed for a limited duration of time. The Court agrees with Defendants. Even if these were not seamen's duties, because these Plaintiffs only performed them for a limited duration of time, these tasks do not change the overall nature of Plaintiffs' jobs, as seamen. *Harkins*, 385 F.3d at 1104 ("the employee must be a (more or less) full-time member of the marine crew"); *Weaver*, 153 F.2d at 600. Further, Plaintiffs fail to explain how these tasks were not related to the efficient and safe operation of the *Winstar* and there is no genuine dispute that these services do not rebut the presumption that Plaintiffs are seamen.

---

[9] Although Judge Posner referenced jury findings, the jury merely found that the Plaintiffs performed housekeeping work such as "keeping [the ship] afloat and clean, scraping the barnacles off its hull, keeping the engines in repair, [and] preventing fires." *Harkins*, 385 F.3d at 1104. The Seventh Circuit then held that this housekeeping work was, as a matter of law, maritime work. *Id.* Here, even if the jury finds that Plaintiffs performed the services that they contend they performed, as a matter of law under *Harkins*, these types of services constitute maritime work.

17

e. **Plaintiffs' Service Moving Slot Machines and Furniture**

Plaintiffs further allege that they moved slot machines, tables, chairs, and signs on and off the *Winstar*. (Pl. SMF ¶ 19). Plaintiffs do not dispute, however, that the distribution of weight aboard the vessel is a critical maritime consideration. (Def. SMF. ¶ 35.) It is also undisputed that the U.S.C.G. must approve of any such move before it takes place. (*Id.*) Therefore, there is no genuine dispute that this moving of slot machines and furniture is a maritime service related to the safety of the *Winstar* as a ship, not a casino.

f. **Plaintiffs' Services Answering Telephones**

Plaintiffs lastly argue that five Plaintiffs answered telephones and performed secretarial duties in the pilot house. (Pl.'s SMF ¶ 20.) Plaintiffs, however, do not argue or provide any support that the telephone calls answered by these five Plaintiffs, or any of the other secretarial duties, were not related to the safe and efficient operation of the *Winstar*. Therefore, these alleged facts do not tend to rebut the presumption that Plaintiffs are seamen under the FLSA.

None of the activities relied upon by Plaintiffs' in support of their assertion that they spent over 20% of their time on non-maritime services, are in fact non-maritime services, under the Seventh Circuit's decision in *Harkins*. Accordingly, there is no genuine dispute that Plaintiffs cannot rebut the presumption that they are seamen under the FLSA and are therefore exempt under § 213(b)(6).[10]

---

[10] Because the Court grants Defendants' motion for summary judgment on all claims on the issue of the seamen exception, the Court does not address Defendants other arguments.

## CONCLUSION

There is no genuine issue of a material fact such that Plaintiffs could rebut the presumption under *Harkins* that they are seamen, exempt under the FLSA. Therefore, the Court grants Defendants' motion for summary judgment on all counts of Plaintiffs' Third Amended Complaint.


Dated:   February 17, 2005                    ENTERED

                                              _____
                                              AMY J. ST. EVE
                                              United States District Court Judge